case which is Eghnayem, if I have the pronunciation right, versus Boston Scientific Corporation. Okay. Okay. Good morning. Good morning. Good morning. May it please the Court, my name is Daniel Rogers. I am here representing the appellant, Boston Scientific Corporation. Your Honors, as you know, this is an appeal from a prescription medical device products liability case. We appeal from substantial verdicts and judgments following a four plaintiff consolidated trial. We raised two different types of issues for the Court today. We raised some case specific judgment as a matter of law issues such as Ms. Eghnayem's claims being time barred under Florida law, plaintiffs not proving their design defect case nor proving their inadequate warnings case. And then we raised some broader new trial issues which could potentially affect future cases in this multi-district litigation proceeding that's pending up north. There are two distinct ways that Boston Scientific was denied a fair trial. First was the fact of consolidation of four fact intensive medical device cases. It was improper when it was sua sponte done initially based upon the pleadings alone and the record bears out that there was substantial, indeed tons of prejudice that resulted as a result of that consolidation. The second way in which Boston Scientific was denied a fair trial had to do with precluding this medical device manufacturer from discussing the regulatory environment in which it operates and the governmental clearance it obtained to market the subject devices. Now this denied Boston Scientific very important evidence that rebutted the plaintiff's main themes in the case concerning things like pre-market testing not being conducted which the FDA doesn't require or that there was a material safety data sheet caution that was important. Boston Scientific wasn't allowed to inform the jury that we actually submitted that to the FDA and the FDA still cleared the device. With the Court's indulgence, I'd like to start with those broader issues first. So first talking about the consolidation. The differences amongst the plaintiffs in this case substantially outweighed the common issues and consolidation was improper. In fact, consolidation is generally improper in nearly all product liability cases and medical device cases because of the fact intensive nature of them. Let's begin with the proposition that you've got to establish that the district court's determination about consolidation constituted a clear abuse of discretion. So we don't start with a blank slate. You've got a hill you have to climb in order to do that. Show us why it amounted to a clear abuse of discretion for the trial court to consolidate the four cases. Well, the first way, the initial consolidation order that was based upon the pleadings basically found that there are substantial common issues that will predominate over the differences. And I believe that the evidence shows that that was a clear error of judgment because the actual differences in this case were substantially greater than the commonalities. At the end of the day, the only common issues in this case was that it involved the same product from women who were implanted with the product in the same state. So therefore, Florida law applied. You have the same defendant and the same product. Those are really the only commonalities that exist here because all of the other issues. Well, the claim was that the Pinnacle device was unreasonably dangerous in a particular way. That was common to the claims of each of the four plaintiffs, right? The design defect claim under Florida law was common, but I think the analysis- What they said was wrong with the product was common, wasn't it? Yeah, in a general sense, but- Well, in a very specific sense. They ascribed two things that they claimed were wrong with that product, and that cut across all four plaintiffs, didn't it? To the extent that they are claiming polypropylene, the use in the device, yes, that was the same- Yeah, that was one of the essential claims they made. It wasn't the only claim they made, but that was common to both, was it not? Yes, Your Honor. What was the second claim they made about the danger in the product? They claimed that there were three different ways that the warnings were inadequate pursuant to- That was common to all of the plaintiffs, wasn't it? Your Honor, as the evidence came out at trial, I don't believe that that was really the focus of the design defect claim, that it was the nature of the mesh. It was more the focus on the polypropylene and how that interacted. They did talk about how when you take the polypropylene and you extrude it out into long strands, it creates more surface area, and they tried to prove that claim. We don't think they did prove that claim because there was no essential element of what is the threshold that's crossed in which it causes harm, but those are the two types of ways that they tried to prove that the product was harmful. And there was something common in terms of the claim about the warnings, right? The sufficiency of the warnings was another part of the plaintiff's case. Yes, Your Honor. Wasn't the claim about whether the warnings were sufficient or insufficient common to each of the four plaintiffs? Yes, Your Honor. They relied on the same expert as to inadequacies, correct. Now, the damages arguably are different. Causation is arguably different. But why wasn't there enough here to allow the judge within pretty broad parameters to try the four cases together without clearly abusing his discretion? Maybe it would have been wiser to try them individually. Maybe if I were sitting on the district court, I would have. But you've got to show me that where there are substantial common issues going to liability and meaningful issues that are disparate, and I think you've got both here, that the district court clearly abused his discretion by putting it into one trial. What Your Honor described would have been appropriate maybe to consolidate on the issue of design defect or on the limited issue of the warning adequacy. But the reason why there was a clear abuse of discretion here and a clear error of judgment is because those disparate issues that Your Honor referenced regarding causation and damages here were the most important and material issues, and they get lost in the shuffle when you have a composite plaintiff proposed. Didn't the trial judge tell the jury they've got to take each case on its own fours and you've got to look at the issue, among other things, of causation and damages individually and specifically to each of the four plaintiffs? Yes, Your Honor, but that instruction, it's our position, didn't really do anything. Do we have to assume that the jury was unable or unwilling to follow the instruction? Well, Your Honor, I think that it was more unable to follow the instruction given the way that the evidence came in in this case, and I think that we've set that forth with regard to the order in which the evidence was presented and the spillover in which the plaintiffs argued their case. Looking at the plaintiff's opening statement and their closing argument, I think, is very telling, where they talk about how the only common issue here is the product. You've got all of these differences, and their closing argument, I think they spent maybe 15% or 16% of their time actually talking about the plaintiffs and 84% of the time talking about the products. It creates a composite plaintiff where you have prejudicial spillover. We had the trial judge even acknowledging that the jury was missing things. We had plaintiff's counsel in the middle of an exchange of cross-examination with an opposing expert where they couldn't even keep straight, oh, did she have it planted in the anterior compartment or the posterior compartment? Nobody could keep those critical, critical facts straight, and those facts are very material because the evidence showed . . . I think you make a pretty strong case with respect to that, but our deference and particularly what I would think is the deference to a district court overcomes most of that. The part of your argument that is most concerning to me is the exclusion of the 501K process, and I hate for you to not get a chance to address that. Absolutely, Your Honor. We think that the district court there made a clear error of law first in determining that this evidence was not relevant. That was an issue for the jury to decide, and the court should not have taken it. This evidence was relevant in two different ways. Doesn't the judge get to decide whether stuff is relevant or not? The judge can decide whether it's relevant, but here there was . . . Our determination is whether the judge properly decided that it was irrelevant, right? Yes, Your Honor. And in this particular case, the judge basically said that, well, yeah, it means something that it was cleared, but it doesn't relate to safety and efficacy. That was the argument that the judge accepted, right? What's wrong with that argument? It seems to be correct. Your Honor . . . If it is correct, then you lose on that argument, wouldn't you say? If it's just not relevant to safety or not directly relevant to safety or if indirectly related to safety would create a whole mini trial. If the judge is right on that, then under our scope of review, we would uphold it. Is that correct? Certainly, Your Honor. I would have to admit if the judge is right on those things, then there was no abuse of discretion, but we submit he was wrong. Indeed, if it's reasonably debatable, even if we might read 403 differently, you've got to show again that there was an abuse of discretion here. Yes. He gets to try the case, and he's got to go beyond the goalposts before we can kick what he did. Isn't that right? Your Honor, I understand that, as you put it, I feel it's an uphill battle on these abuse of discretion standards, and I agree that it is a tougher standard of . . . Okay, so tell me why it amounted to an abuse of discretion when the district court explained, quote, that it saw little relevance in the fact that Pinnacle was cleared pursuant to the 510K process because the Supreme Court had explained that, quote, compliance with 510K focuses on equivalence, not safety, and that products entering the market through the 510K process have never been formally reviewed for safety or efficacy, end quote, and the court explained that the jurors are likely to believe, or at least he was concerned that the jurors were likely to believe that the FDA enforcement relates to the validity of the tort claims, which it does not, and then it might have provoked the parties to engage in a time-consuming and collateral battle, a mini trial, if you will, on whether BSC, in fact, complied with the regulations. Why couldn't he say it was wiser on balance to keep this out? Because whatever probative value it had in advancing the theory of safety was modest and limited, maybe not nonexistent, but the dangers of confusion were great, and you could compound the length of the trial considerably if you moved into a new ballpark and had to address this mini issue. Why couldn't he say that and fall within the ambit of his discretion? Number one, Your Honor, because as to the minimal relevance that he found, we believe that was a misapplication of the law precedent relying upon the grandfathered provision of the 510K when this was not a device that was introduced pursuant to equivalent to a device that was cleared pursuant to the grandfathering provision. This device, the pinnacle device, was actually substantially equivalent to a device that had received a safety review, a comprehensive safety review that it was equivalent to, so that was a clear error of judgment, number one. But as to the balancing of the things and whether or not it would have confused the jury, well, the discussion that we believe just had about jury instructions, I think, is more apt here than it is in the consolidation context, because here the judge can instruct the jury specifically as to what the significance of 510K means, and that's an instruction that a jury can understand, which is very different from the concept of when you're throwing evidence at a jury of four different plaintiffs, and then a judge says, oh, you need to keep that straight. That's a subconscious thing. You can't unconfuse a jury with an instruction like that. However, when you're dealing with the significance of 510K and whether or not it is dispositive of the case, that's a type of instruction that a jury can receive and should be able to follow. This seems to be the same issue as in the Fourth Circuit case. Is that correct? Correct, Your Honor. And they affirmed the same trial judge there. Yes, Your Honor. Is there anything materially different? I know we're obviously not bound to follow it, but is there anything materially different from this case than in the Fourth Circuit case? Yes, Your Honor. Aside from the fact that we believe that there was a misapplication of lore there, and obviously we disagree with that, the distinguishing factor here I'm just talking about the 510K evidence. That's all I'm talking about. The distinguishing factor here in the 403 analysis between this case and the Sisson case had to do with the facts that drive the 403 analysis regarding how relevant this was to rebut the plaintiff's themes in this case. There were two central themes. Was there one plaintiff in the Fourth Circuit case or was it consolidated to it? That was a one plaintiff case, Your Honor. One plaintiff, okay. In this case, you had central themes that were being pressed by the plaintiffs about a lack of pre-market testing, about how the warnings for the pinnacle device... You're just saying it was more relevant here than it was in that case. And its exclusion was deeply, deeply prejudicial here when it wasn't in that case, if you're talking about the balance. You've answered my question. Thank you. I see my time has concluded, Your Honor. And you have been answering our questions, so you have reserved your full rebuttal time. Thank you. May it please the Court. My name is Rebecca Vargas. With me is my partner, Stephanie Serafin, and our co-counsel, Mike Moreland. Also in the audience is one of our trial attorneys, Amy Romanilli. The final judgment should be affirmed. Boston Scientific failed to show any ground for reversal of these judgments. Like Boston Scientific, I plan to focus on the consolidation and 510K arguments. Unless this Court has questions on the others, the .3 and .4, I'll plan to rely on my briefs and ask the Court to affirm on those points. Turning first to consolidation, I believe that Judge Marcus hit it on the head. This trial judge who has been charged with presiding over 104,000 of these transvaginal mesh cases in seven different MDLs had very broad discretion to consolidate these four similar cases for trial. These four plaintiffs brought very similar claims all under the same Florida law for design defect and for failure to warn. And the trial court had broad discretion to decide that those general issues of design defect, failure to warn, whether this device could cause this type of injuries substantially outweighed any of the individual differences between these plaintiffs. Let me ask you a question. What are we to make of the fact that when you look at the verdicts themselves, they're almost identical. In two of the instances, they are identical. 67,000,722,222 for two. The third one was 6,766,666. And the fourth was 65,33,333. He suggests that these verdicts in this amount suggests that they really were confused. This... It would be remarkable. What they did was they obviously lumped them all together and came out with the same result, even though the nature of causation and the nature of harm and damages was profoundly different from plaintiff to plaintiff. And this suggests, albeit in a circumstantial way, one reason why the district court made a mistake in lumping all four together. Well, Your Honor, I would... The trial court presiding over the motion for a new trial considered that exact argument, and he rejected it as guesswork and speculation and trying to work backwards from the jury's verdict because the amounts of the verdicts were well within the reasonable amount for the jury to... We often work backwards from the award and ask whether the award was reasonable and whether it was tethered to the corpus of evidence. So it wouldn't be unusual that we work backwards. Well, Your Honor... This court's always working backwards. I understand, Your Honor. Right? Yes, I agree. But in this case, I think it really goes... Rather than showing the confusion of the juries, it goes to show just how similar their injuries were. They were... The jury was instructed before, at the beginning of trial and at the end of trial, to consider each of these plaintiffs' cases individually, to consider the strength of their evidence on each plaintiff's merits, to consider the damages on their own merits. And there's no evidence, there's no jury question or anything else to indicate that the jury did not follow those instructions. And in this case, there were very similar damages suffered by these women. Each one of these four women was implanted permanently with this mesh. We presented evidence that it was, as part of the design defect was, that it was irreversible and couldn't be removed from their bodies. So each of these women suffered erosion, contraction of the mesh, pain in the pelvic area, pain during intercourse. They had to undergo painful procedures and in-office procedures to try and remove that mesh. And then, again, surgery under anesthesia. Each one of these women went under at least one surgery, under general anesthesia. Some went under as many as three surgeries. And so, and the jury award did differentiate. The two plaintiffs that were awarded the same amount, Ms. Ignayem and Ms. Bentecourt, actually had very similar injuries. They both had one in-office procedure to remove exposed mesh and one general anesthesia. If one of these cases had been tried by itself with evidence about the problems of the other three plaintiffs have been admissible as similar transactions or similar evidence, or would it probably have not been admissible? No, Your Honor. I think that this jury, and that's what the trial court found, that even if these cases were not tried together, that the incidents of similar injuries would have been admissible for several purposes. For example, to show notice of the defect and to show the tendency for the injury. And so that's what the trial court concluded, that it was not prejudicial because when evaluating the defect, that this type of evidence would have been . . . For example, in this Fourth Circuit case, was other similar injuries introduced? I'm sorry, Your Honor, but I'm not part of the Fourth Circuit case, so I'm really limited to the briefs and the record in that case. Okay. But . . . I'm just curious, are most of these trials single plaintiffs? Well, there were . . . I'm just trying to understand the universe. Sure. There are hundreds of them. At the same time that our four plaintiffs were tried here in South Florida, almost concurrently, there was a four-plaintiff trial tried in the home court, the Southern District of West Virginia. It was actually tried by a substitute judge while Judge Goodwin was here. So that case is also proceeding up in the Fourth Circuit and is currently being briefed. And then we also . . . But the ones that have had published decisions so far have been single plaintiff trials. Okay. Thank you. Sure. But turning to the . . . this Court's decision in Hendricks, it's recognized that the trial judges have very broad discretion to consolidate when there's common issues in court or law. And in this case, the evidence on design defect and failure to warn was pervasive in this trial. I think the extent of time the plaintiffs spent in closing argument, while it was more directed to the general causation, I think that just goes to show of what a much more significant issue the general causation was than the failure to warn. We presented the same . . . Each of these four women presented the same evidence, the same expert witnesses on design defect. They each presented Dr. Jimmy Mays, who was a polymer chemist. He testified to the nature of the polypropylene, the nature of the design, the fact that it eroded and degraded when exposed to oxygen, and then became stiff, hard, brittle, cuts through these women's bodies in an area that's designed to be flexible and soft and sensitive, and yet this mesh degrades, hardens, and cuts through their tissue like fishing line. In addition, we presented the expert Dr. Margolis, a urogynecologist, common to each one of these plaintiffs, who testified that the crosshatch design of this mesh made it impossible to remove and irreversible, which was a very serious concern that should have been included in these defendant's warnings. And so he was an expert as to the design defect and the warning that was common to each of these four plaintiffs. Actually, one of the plaintiffs, it was able to remove from one of the plaintiffs. Actually, Your Honor, her doctor tried, but her testimony was she was not able to completely remove all of the mesh, although that was certainly the attempt of the surgery. Her testimony was at page, at docket entry 315, pages 29 to 30. She testified she could not remove all the mesh, and excessive bleeding prevented her from doing that. So Ms. Agneim, just like the other plaintiffs, suffers that same risk of repeat surgery over and over again because this has been irreversibly implanted in the body and can't be removed. We also presented the testimony of Boston Scientific Witnesses. There were six witnesses from Boston Scientific or their independent consultants who testified about the process of designing the product, what Boston Scientific knew before it released the product, which, not surprisingly, was that they understood the risks of erosion, they understood the risks of multiple procedures, yet they proceeded to go ahead and market this project without doing clinical tests on women. We presented an FDA, or excuse me, a regulatory expert, who talked about marketing, who Dr. Peggy Pence just testified as to really the state of what Boston Scientific's knowledge was and whether or not a clinical test was necessary before marketing it, and she did agree that clinical tests should have been undergone. Counsel, I just wanted to express why I think the second issue is more troubling. I mean, normally when we have a jury verdict in a difficult case where the judge has been making discretionary determinations one after the other, we give them a lot of leeway. Where it's more problematic to give them leeway is if they kept something from the jury that a jury might really have come to a different conclusion. At least from my perspective, that's where I focus. And the part of this case that appears to be like that is the 510K issue because if the jury knew that this defendant was complying with regulatory requirements, which were at least indirectly safety-related, that would go kind of to the heart of much of the case. And that evidence appears to have been broadly excluded for questionable reasons. Can you address that? Sure, Your Honor. I'd be happy to. The Fourth Circuit, as Judge Hull pointed out, recently addressed this exact issue in the context of two transvaginal mesh cases. The first is Sison v. C.R. Bard, and the second is Husky v. Ethicon. Both of those involved, they were reviewing orders by the same trial judge, Judge Goodwin, as our case. The same judge? Yes, it's the same judge. He presides over the multi-district litigation, and he's native to the Fourth Circuit. That's somewhat persuasive that some of our colleagues in a different circuit came to a different conclusion, but how do you address that? And I understand that it's persuasive as opposed to controlling authority, but I think they had a very heavy... What's the argument? I'm not seeing the argument just that it lost in another circuit, or won in another circuit, but what's the argument? I mean, why shouldn't the jury get this? It is related to safety indirectly, isn't it? Because it's not like the Rohr case. Is it Lohr case or Rohr case? Lohr, yes. Lohr case. In Lohr, you were dealing with equivalence to something that had been grandfathered in, whereas this is an equivalence to something that's been deemed to be sufficiently safe. Is that not right? No, Your Honor. First of all, Boston Scientific, if you look in the trial court, their response to the motion to exclude Dr. Christine Brower on the Dauber grounds, their only argument in response to Medtronic v. Lohr was that it is a preemption case, not an evidentiary case. They did not make the distinction that you're making, Your Honor, in which Boston Scientific... Well, I'm allowed to evaluate precedents to see whether they're controlling or not in reviewing a legal determination that the district court makes, aren't we? Certainly, but they do need to preserve their arguments for review. They hadn't made it in the trial court. So if they don't make an argument that distinguishes a case, we're bound by the case, even if it's distinguishable? Well, I'll be happy to distinguish it. I just wanted to point out their preservation issue. All right, okay, got that. Okay, great. Actually, it sort of weakens your case to make such a technical objection to... Well, anyway, go ahead. Yes. The reason the Lohr v. Medtronic is on point is because in that case, the U.S. Supreme Court was deciding whether or not the 510K process preempted state law and what it held is the 510K process really goes to the substantial equivalence of the product and not to its safety or effectiveness. And that's why the controlling analysis is whether or not this is unreasonably dangerous under state law, not whether or not the product complied with the 510K process and whether or not... It's not part of state law whether the defendant has complied with safety regulations of the government, whether it's the state or federal government. It is only a part of state law, product liability law, whether they've complied with government regulations when those government regulations go to safety and effectiveness of the product. Right. In this case... So that's the argument that it does because this is a provision which categorizes these products as being, I guess, in the same category as something that has passed a safety threshold. Well, Your Honor, even before the Husky case... Apart from cases, what do you do with the actual argument? Well, the actual argument is that because what the FDA is focusing on is substantial equivalence to an earlier product, it's not an independent safety determination and so there's a very real risk of confusing and misleading the jury that they get this imprint and this stamp of approval from the FDA making it sound like it's a determination of safety and effectiveness when actually it's really not. It's a determination that it's equivalent to an earlier product. An earlier product that has been determined safe and effective or not. Right, Your Honor, but it's not the same as saying this product is safe and effective. It's not the same, but it's logically pretty close, isn't it? That's where I'm hanging. You know, this is the one thing that bothers me about this case. Well, the case is... Is that you say, well, there's a determination that this is in safety terms equivalent to something that has passed a safety test, but that's not safety. That sounds wrong. Do you see what I'm concerned about? I hear what you're saying, but so far the other circuit courts who have considered this haven't. But I'm wanting to know the substance of the answer, not that you've won on this elsewhere. Well, the substance of the answer is as was stated by the Sixth Circuit in Rodriguez, the FDA's action means only that no other device on the market carried that indication for use. It doesn't mean the pump was dangerous for that particular use. That involved the flip situation where the plaintiff was trying to admit evidence that the FDA had denied 510K clearance, and both the Sixth Circuit and the Tenth Circuit in the Mack v. Stryker case held as not admissible. The plaintiff cannot use this evidence that the FDA denied clearance to prove defectiveness because it doesn't go to the product's safety. Help me with this Florida law issue. This case is about Florida law, right? That's right, Your Honor. And the Florida statute 768.1256 expressly provides that if the aspect of the product that allegedly caused the harm complied with the federal and state regulations relevant to the harm, the jury should be told that and the evidence should come in. That's how I read that statute. Well, yes, Your Honor. The statute, though, only applies when the regulation is designed to present the type of harm. So for the reasons that were discussed in Husky, Sison, the Sixth Circuit, the Tenth Circuit, it's not designed to present... They're not construing a Florida statute. They're not, but we did cite the Tingey v. Radionics case out of the Tenth Circuit. That involved a very similar government rule statute out of Utah. Now, it's not a Florida statute, true, but it's very similar. But this statute seems to contemplate that regulations and matters by the federal government that are relevant to the harm here are doing harm as opposed to safety. Right. Because that's what the statute says. It doesn't say safety. It says relevant to the harm. Well, it was a very similar statute in Tingey, and it said that the 510K clearance lacks independent substantive content and imposes no standards. Am I correct? There is no Florida appellate case construing this statute? That's right, Your Honor. At all? That's right, Your Honor. Not that I've found. The closest we found was the Tingey case out of the Tenth. So it's really unclear whether this is the type of process, the 510K, that this statute's contemplating. No, Your Honor, I don't think it's unclear. I think that as the district court recognized that this is not designed to prevent the type of harm involved here because really it's just to show that it's similar to an earlier product rather than imposing a specific safety requirement on this product required for sale. Why are the 510K process not designed to prevent harm? Well, Your Honor, it is, as I've mentioned, instead of preventing harm, it is designed to show that it's equivalent enough to an earlier product. The Regal decision out of the U.S. Supreme Court... An earlier approved product. An earlier approved product. But as Regal explained, the 510K... So to let it go on market, it's got to go through that process to show it's equivalent to a similar product and that helps reduce the potential harm of this new product going on the market. Why is that wrong? Well, but the U.S. Supreme Court in Regal v. Medtronic said that that compliance is really more to provide an exemption to the manufacturer from safety regulations rather than imposing a specific requirement on the manufacturer. Okay, you've answered it. Thank you. But I'm not sure I get the answer totally. If...similarity could mean lots of things. The name could be similar or the chemical content could be similar or it could have passed similar safety tests. What do they look at when they're trying to tell whether it's similar or not? Well, Your Honor, that question actually just invites the type of mini-trial that Judge Goodwin was concerned about here because it would invite... No, I'm asking a question about the nature of 501, which is the 510, I'm sorry, which is the whole nature of your argument is that 510 doesn't go to safety. I'm asking if it does go to safety and you say, well, I can't answer that because it's a mini-trial. That doesn't make sense to me. Well, the 510k process says that if it's an article or if it's a type 2 device, then it can be marketed because it's substantially similar to an earlier product and they can put special controls on it. But as I... But you can't say there's nothing more in the law or in the record which tells us what they mean by similar. Similar could mean similar with respect to all kinds of things. Similar in the number of years that it's been out or similar... No, Your Honor... Similar in the states where it's been produced or similar... What does the similar relate to? Do you see what I'm asking? No, I understand, Your Honor. And they do have a definition of substantially similar, substantial equivalence, and it's in... Looks like subsection I of the statute and it talks about it's substantially equivalent if it's... has the same technological characteristics or it has different technological characteristics and the information is substantially equivalent to the predicate device that contains information including appropriate clinical or scientific data deemed necessary by the FDA. But again, that just goes to... That makes it seem like you're determining that this is the equivalent of something that's been tested or if not tested, at least determined that a test isn't necessary. It's determined that it's the equivalent for those kinds of purposes to something that has passed muster per the agency. It just seems very artificial to say that doesn't relate to the criteria that were applied to the thing that it's equivalent to. Well, Your Honor, I think under that reasoning, I think that there would have been a different outcome in the Medtronic versus Lohr case if it were something to... The difference that they draw... Pardon me for interrupting, but the difference that they draw in the briefs is that in Lohr, they were dealing with a grandfather situation where there hadn't been any kind of testing or determination that testing wasn't necessary or whatever. It was just a pure grandfather thing. Whereas in this case, we're talking about a provision that deals with substantially similar to something that has gone through something like that. Right. In the Lohr case in footnotes three and four, they do discuss the 1990 amendments that defense counsel is relying on this case. There's nothing to indicate in the Lohr decision that those 1990 amendments are going to change the analysis because the FDA is changing the definition of what is required to demonstrate substantial equivalence. And if you look at Boston Scientific's brief, they have a footnote where they recognize that no other case has made this distinction that they're drawing. And it's contrary to those decisions that I mentioned from the 10th Circuit, from the 6th Circuit, from the 8th Circuit, and from the 4th Circuit. And so I think as the 4th Circuit held, the substantial weight of... Which one of those cases presents the argument that's most likely to persuade me? Well, Your Honor, I think that the Sison case and the Husky case are both very recent. Which circuits are those? Those are both the 4th Circuit, Your Honor. 4th Circuit cases. Reviewing this exact same trial judge. And he's ruled consistently throughout these MDL cases excluding this evidence. And I think it's a very helpful analysis for the reasoning. Thank you. I'm sorry. I think you've... Yes, I was just going to... More than explored the... I'm sorry? If you can bring your remarks to a head, thank you. Thank you, Your Honor. I appreciate that. With that said, I would like to ask this Court to affirm the judgments. And that is it. I appreciate your time. Thank you. Thank you. Mr. Rogers, you've reserved three minutes. Thank you, Your Honor. Addressing the FDA issue, let me first note that the jury was entitled to know about the regulatory compliance evidence pursuant to Florida law. And Judge Holwell, there has not been a Florida appellate decision that has addressed that. We did cite the court to the Aradia and Zomenta litigation that was going on in Tennessee, I believe. And then it was appealed up. And in that case, they applied this Florida statute, actually, to enter summary judgment in a drug case because there was compliance with the FDA regulations. So there is precedent for the application of this in the FDA context, in the drug context. We also need to look at the... This Court should give great deference to the FDA's determination, which has been repeatedly stated, even as recent as this year, which we've cited to the Court, that this is something that is relevant. And we provided this argument in the record below in our 510k proffer, which I encourage the Court to read. I think we've preserved all of these issues. But the real... What significance are we to attach to the fact that the PMA process is really a federal safety review and the 510k process is not? And that the 510k process isn't really comparable in any meaningful way to the PMA process because, in contrast to 1,200 hours, for example, necessary to complete a PMA review, the 510k review is completed in only 20 hours. We made reference to that, and that's why I'm asking you. In one of our cases, another Medtronic case, we say the FDA completes the average 510k review within 20 hours. The agency reviews only whether the device is indeed the equivalent of a preexisting device, regardless of how unsafe or how ineffective the device happens to be. Isn't there a powerful difference between the two processes? Your Honor, there's certainly a difference between the processes. I don't think it is as significant in this case because there was substantial time and there were panels of experts that classified and determined the safety of the medical device that was determined to be substantially equivalent, and so while the 510k on the pinnacle may not have been as robust as a PMA, there were, I think, three years. Well, it undoubtedly was not. Sorry, Your Honor? You say may not have been. It was undoubtedly not the equivalent. Well, there was not the 1,200 hours on this 510k, but if you look at the history of the predicate devices, there was, I believe, three years in which these pseudoscientific and medical panels analyzed this issue and they looked at the predicate device of surgical mesh. Then there was a public comment period. Then the FDA spent time reviewing that types of things. So there is certainly not just a typical 510k grandfathered, well, let's look at 20 hours to see if this is equivalent to a grandfathered device that was at issue in lore. There is a substantial and robust record that could have been presented to this jury that would have established that it was something to do with safety and effectiveness and that Boston Scientific was reasonable for that, for complying, and it went to the heart of the issues in this case regarding things like pre-market testing and whether or not the warnings were based on those testings and whether or not the FDA considered in that limited 510k. Pardon me. Could you have presented that information without specifically presenting the 510 information, just saying something indistinguishable had a lot of tests made with respect to it, or would you have been precluded from doing that as well? Judge, there was a very stern warning from the trial judge about not getting into anything, having anything remotely to do with the FDA. So if we would have said, well, this is equivalent to this device, I don't understand how we could do that. We did present evidence, obviously, that there is a strong history of mesh and has been used in the body for decades and all of that, and we did present that type of evidence, but we were not able to present the evidence that this was cleared as something that was substantially equivalent to something that had such a robust and approved safety review by the federal government as substantially equivalent to other devices when they're putting up PowerPoints and opening statements saying it's a different product, it's not equivalent to anything else out there when the FDA had determined that it was. This was just deeply, deeply prejudicial in this case, Your Honor. And so we believe that there should be a reversal. I see my time is up. So we believe we understand that there are abuse of discretion issues that we are bringing before the court. We think that the nature of this multidistrict litigation and the issues that are raised in this multidistrict litigation and the potential for the due process concerns, this court should actually give closer scrutiny to the discretionary decisions in this case because of their far-reaching ramifications. One last question. You said you made a 510K proffer. As part of that proffer, did you also put in evidence about what the robust safety review process had been on that other device? We did reference the predicate device of the surgical mesh, and we cited to that. I apologize, I don't recall how much of that information is attached as an exhibit. 510K proffer in the record. Do you know offhand or...? It was filed in the middle of trial. Okay. It's in the middle of trial. 295, I believe. I believe it's docket entry 295. Thank you. Okay. Thank you, Your Honors. Thank you both. We'll proceed with the next case.